UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
                                )
UNITED STATES OF AMERICA        )
                                )
              v.                 )    CRIMINAL NO. 10-10159-PBS
                                )
TODD LYONS                      )
DANIEL EREMIAN,                 )
                                )
              Defendants.        )
                                )
```

**FINDINGS OF FACT AND CONCLUSIONS OF LAW
AND ORDER OF FORFEITURE**

June 11, 2012

SARIS, U.S.D.J.

## I. INTRODUCTION

Defendants Todd Lyons and Daniel Eremian were convicted after a jury trial of racketeering conspiracy in violation of the Racketeering Influenced and Corrupt Organizations (RICO) Act, 18 U.S.C. § 1962(d); racketeering in violation of 18 U.S.C. § 1962(c); operating an illegal gambling business in violation of 18 U.S.C. § 1955; and violating the federal Wire Act, 18 U.S.C. § 1084.[1] They waived their right to a jury trial on the government's forfeiture allegations. The government now seeks a joint and several Order of Forfeiture (Money Judgment) in the amount of $41,650,263 pursuant to 18 U.S.C. § 1963 and Fed. R.

_____

[1] Defendant Lyons was also convicted pursuant to 18 U.S.C. § 1957(a); 18 U.S.C. § 1952(a)(1); 26 U.S.C. § 7206(1); and 31 U.S.C. § 5363(3).

1

Crim. P. 32.2(b).  After a three-day bench trial beginning on
March 26, 2012, the court makes the following findings of fact
and conclusions of law.

## II. FINDINGS OF FACT

This case concerns a large gambling enterprise, Sports
Offshore ("SOS"), headquartered in Antigua and operating in
Massachusetts, Florida, South Carolina and other parts of the
United States from 1996 through 2010.  The leaders of SOS were
co-defendants Robert Eremian and Richard Sullivan.  They live in
Antigua and remain fugitives.  SOS allowed people in the United
States to place bets on sporting events by making telephone calls
to Antigua or visiting an internet website.  Losing bettors
regularly made payments in cash to SOS agents located in the
United States, and other payments were submitted via checks made
out, or wire transfers sent, to shell corporations, like
Benevolence Funding and De Soto, Ltd.  Winning bettors received
their winnings from SOS agents in the United States.  SOS agents
were paid commissions of approximately 25%-50% of the losses of
the bettors they managed.  Forfeiture Tr. Day 1 at 54-55.

Defendants Todd Lyons and Daniel Eremian were members of
this large SOS enterprise.  Lyons worked for SOS in Massachusetts
and received a salary.  Lyons served in effect as a bank for SOS,
and he also worked as an SOS agent.  He was the primary collector
of cash and checks for SOS in Massachusetts.  He regularly met

with many SOS agents in Massachusetts to collect from them the large quantities of money they had collected from their bettors, and he paid out money to SOS agents so they could pay winning bettors. He also served as an agent himself by collecting money directly from, and paying money directly to, his own bettors.

Daniel Eremian, the brother of Robert Eremian, played a role in the SOS conspiracy, conducting SOS activities primarily in his home state of Florida. He traveled with others from the Boston area to Antigua in 1996 for a few weeks to help his brother set up and start the SOS operation, and over the next fourteen years he made more than a dozen trips to Antigua. In Florida he served as an agent collecting money directly from losing bettors and recruiting new bettors. From time to time, his brother Robert would visit him in Florida and discuss SOS business. Their sister, Patricia Tierney, assisted Robert Eremian in Massachusetts.[2]

Because the SOS enterprise was so large, involved many bettors and agents, and operated in multiple distinct locations, not all activities by all who were involved in all locations were reasonably foreseeable to each person who conspired to advance its unlawful aims. Given the nature of this particular enterprise, I find that SOS proceeds generated by agents not

---

[2] She pleaded guilty to aiding and abetting the filing of false tax returns.

known to Eremian or Lyons at the time they were generated, or by bettors of agents not known to that defendant, were not reasonably foreseeable to that specific defendant. On the other hand, proceeds generated by SOS agents known to a defendant to be a SOS agent, or by bettors of those agents, were reasonably foreseeable to that specific defendant.

In making factual findings regarding the proceeds subject to forfeiture, I will consider the five categories of proceeds addressed by the parties in their briefs: (1) cash proceeds recorded in Lyons' gaming notebooks; (2) estimated cash proceeds that were not recorded in those gaming notebooks; (3) checks deposited, and wire transfers sent, to the accounts of SOS shell corporations; (4) checks deposited into Todd Lyons' personal bank account; and (5) checks deposited into Daniel Eremian's personal bank account.

### A. Gaming Notebooks

Lyons maintained detailed hand-written ledgers enumerating the cash he received and paid out for SOS. These gaming notebooks were seized from his home in 2006. (See Gov. Ex. 18 through 28.). Special Agent Sandra Lemansky of the Internal Revenue Service analyzed these notebooks and other financial records related to the proceeds of the SOS gambling operation. As Lemansky credibly testified, the notebooks contain weekly entries from March 1997 through September 2005 indicating the

amount of cash Lyons received from and paid out to various SOS agents and the bettors he directly handled as an agent. <u>See</u> Forfeiture Tr. Day 1 at 49, 61. Although SOS continued to operate from 2005 through 2010, there are no gaming notebooks recording cash flows during that time period. The agents are identified in the notebooks by name or agent number, such as "#83." Gov. Ex. 18 at 3. In addition, the amounts Lyons received are noted in "in" columns and the amounts he paid out are noted in "out" columns. <u>See, e.g.</u>, <u>id</u>. Finally, the entries near the top left-hand corner of the pages represent the amount of cash Lyons had on hand at the beginning of the week. The sum of the amounts listed in the "in" columns of all eleven notebooks covering March 1997 through September 2005 is $21,965,024. <u>See</u> Forfeiture Tr. Day 1 at 61-62. This sum is the gross amount of cash collected by Lyons on behalf of SOS.

No evidence was presented that Eremian knew Lyons, or knew about Lyons. While Eremian was a native of Massachusetts and his relatives (i.e., sister and mother) continued to reside there, there is no evidence that he spent any time in Massachusetts between the time SOS began operating in 1996 and 2010. However, it is likely that Eremian was aware of SOS operations in Massachusetts during that time period because he helped his brother set up SOS for the first few weeks of its operation in Antigua. Still, because Eremian lived in Florida and worked as

an SOS agent there, his perception of the amount of proceeds generated was limited. Accordingly, the government has not proven it was reasonably foreseeable to Daniel Eremian that Lyons would collect a total of $21,965,024 in proceeds from a large number of agents in Massachusetts on behalf of SOS from March 1997 through September 2005.

Some of the cash proceeds Lyons collected came from Christopher Means, an individual who had worked alongside Eremian in setting up SOS operations in Antigua for several weeks in 1996. Eremian knew that Means was an SOS agent from Massachusetts. When Means returned to Massachusetts from Antigua, he worked as an SOS agent and periodically met with Lyons to give him cash or to get cash from him. Lyons collected $1,338,300 in cash from Means between 1996 and 2005. Forfeiture Tr. Day 2 at 106. Because Eremian knew that Means was from Massachusetts, and was an agent for SOS in Antigua, the $1,338,300 of gambling proceeds that Means collected from bettors and then provided to Lyons were reasonably foreseeable to Eremian.

The government contends that the cash Lyons collected from SOS agent Mark Thomas was reasonably foreseeable to Eremian. In 1997, Thomas moved to Florida and began betting with SOS there. On two or three occasions he met Eremian in Florida parking lots to "settle up [his] debts." Forfeiture Tr. Day 1 at 150.

However, no evidence was presented that Thomas worked as an SOS agent in Florida; the evidence of his Florida SOS activities was limited to his betting with SOS as a customer. Thomas later moved to New Hampshire where he served as an SOS agent collecting from bettors and then providing money to Lyons. No evidence was presented indicating Eremian knew Thomas began working as an agent. Accordingly, the government has not proven it was reasonably foreseeable to Eremian that Thomas, who had been a mere bettor in Florida, would begin collecting cash from other bettors and providing it to Lyons.

The proceeds Lyons collected from SOS agent John Olsen were also not reasonably foreseeable to Eremian. Lyons collected $2,352,530 in cash from John Olsen. See Forfeiture Tr. Day 1 at 147; Government Exhibit 327. Olsen began "settling up with" Lyons "towards the end of the '90s." Jury Trial Tr. 13-155. Olsen and Lyons would meet in Massachusetts at Olsen's house, in a parking lot, or elsewhere and exchange cash. In August of 2001, Olsen moved to Florida (for reasons unrelated to SOS) and stopped providing cash to Lyons. See id. at 13-156 to 13-159. Tom Driscoll took over Olsen's role as an SOS agent collecting money from Olsen's bettors in Massachusetts. See id. at 158. Following the suggestion of Richard Sullivan, who managed SOS in Antigua along with Robert Eremian, Olsen went to meet Daniel Eremian at a restaurant Daniel owned in Florida shortly after

Olsen moved to that state.  There was no evidence that Daniel Eremian knew about Olsen prior to their meeting in Florida. Thus, the proceeds Lyons collected from Olsen in Massachusetts before Olsen moved to Florida in 2001 were not reasonably foreseeable to Daniel Eremian.

In sum, of the $21,965,024 in cash proceeds that Lyons collected in Massachusetts, only the $1,338,300 collected from Christopher Means was reasonably foreseeable to Daniel Eremian.

## B. Extrapolating Other Cash Proceeds

Although there are no gaming notebooks that record cash Lyons collected after September 2005, SOS gambling operations continued until April 2010.  <u>See</u> Forfeiture Tr. Day One at 63. The government seeks to forfeit $9,571,900 as cash proceeds collected in Massachusetts from January 2006 through April 2010. It explains that this sum represents an extrapolation estimate for that time period based on the average cash proceeds recorded in Lyons' gaming notebooks for the time period of 1997 through 2005.  <u>See</u> Doc. No. 236 at 5.  The government has not found any records documenting the amount of cash that SOS actually collected from January 2006 through April 2010.

It is difficult to estimate the quantity of cash SOS collected in Massachusetts from January 2006 through April 2010 because the 1996-2005 time period was not substantially similar to the 2006-2010 time period.  Most significantly, law

enforcement authorities disrupted SOS operations by searching and seizing evidence from Lyons' home in 2006 and 2009. See Jury Trial Tr. 6-159 to 6-164. After the Massachusetts State Police searched Lyons' home in 2009, SOS agent Christopher Means took over collection duties from Lyons. See id. Moreover, economic conditions, such as the financial crisis in 2008, changed between the two time periods. These changes likely affected the amount of cash SOS collected. Thus, the evidence is insufficient to calculate accurately a forfeiture award with respect to these proceeds collected by SOS in Massachusetts from 2006 through 2010.

There were, however, two specific reported cash collections by Lyons between September 2005 and April 2010 that are subject to forfeiture. First, Christopher Means, who assumed collection duties on behalf of Lyons after law enforcement officials searched Lyons' home in 2009, provided Lyons with $400,000 in SOS cash proceeds that he had collected. See Jury Trial Tr. 6-161 to 6-164. Because Eremian knew Christopher Means and had worked with him for SOS in Antigua, the $400,000 of gambling proceeds that Means collected from bettors and then provided to Lyons were reasonably foreseeable to Eremian. Second, Linda Richardson, who was romantically involved with SOS leader Richard Sullivan, provided Lyons with $200,000 in SOS proceeds after September of 2005. See id. at 7-60, 7-70 to 7-71. Thus, Lyons collected a

known total of $600,000 in cash between September 2005 and April 2010.

## C. Shells on the Antiguan Corporate Shore

The SOS enterprise also generated substantial recorded proceeds in the form of checks made out, and wire transfers sent, to SOS shell corporations. The accounts of these shell corporations served as repositories for SOS gambling proceeds. Some of these checks and wire transfers were sent by Lyons' betting customers at his direction, while others were sent by betting customers of agents from whom Lyons collected cash in Massachusetts and by those agents themselves. See Forfeiture Tr. Day 1 at 70-73. The total amount of money transmitted to the accounts of SOS shell corporations from Lyons' customers, agents from whom Lyons collected cash, and the customers of agents from whom Lyons collected cash was $1,853,152. See id. at 85. These proceeds were reasonably foreseeable to Lyons because they resulted from his work for SOS or the efforts of agents he knew worked for SOS. On the other hand, the proceeds deposited to the accounts of shell corporations via check or wire by bettors or agents not connected to Lyons were not reasonably foreseeable to him.

Other checks and wire transfers were deposited in the accounts of shell corporations by customers of Daniel Eremian, or by customers of people whom Eremian knew to be SOS agents, and

were thus reasonably foreseeable to Eremian. Eremian's customers sent $101,827 in checks and wire transfers to the accounts of shell corporations. <u>See</u> <u>id.</u> at 166. In addition, the customers of Tim Lowry, an SOS agent from whom Eremian collected money, sent $282,250. <u>See</u> Forfeiture Tr. Day 1 at 166. Similarly, SOS agent John Olsen and his customers sent $502,000 in checks and wire transfers. <u>See</u> Government Exhibit 188-1 at 1. Unlike Lyons' cash collections from Olsen, which occurred before Olsen met Eremian in Florida in 2001, these payments were made between 2004 and 2007 after Olsen, at the direction of SOS leader Richard Sullivan, met Daniel Eremian. Moreover, Olsen informed Daniel Eremian that he was an agent for SOS. <u>See</u> Jury Trial Tr. 13-160. Thus, this $502,000 was foreseeable to Eremian.

The $3,779,601 sent by Frederick Porter's customers to shell corporations, <u>see</u> Forfeiture Tr. Day 1 at 178, were also reasonably foreseeable to Daniel Eremian. Daniel Eremian met Porter in 2002 when Porter came to Daniel's Florida restaurant. Porter, who at that time had been working as an SOS agent, came to the restaurant to meet Daniel's brother, Robert Eremian, and to speak with him about taking on an additional set of customers. <u>See</u> Jury Trial Tr. 11-145. Although Daniel did not participate in the meeting between his brother Robert and Porter, Porter had come to the restaurant for the specific purpose of discussing his role as an SOS agent with Robert and he met Daniel at that time.

Over the coming years Porter met Daniel "on a number of occasions." Jury Trial Tr. 11-157. Most of these meetings occurred when Robert Eremian was visiting Daniel and they met for lunch. _See id._ at 11-157. Thus, it was reasonably foreseeable to Daniel Eremian that Porter worked as an SOS agent and had customers who would generate $3,779,601 in gambling proceeds.

The $945,347 sent by Richard Ducharme's customers to shell corporations, _see_ Government Exhibit 327, were also reasonably foreseeable to Daniel Eremian. Ducharme ("the Duke") originally met Daniel Eremian in 1988 at the Peabody, Massachusetts, bar that Daniel Eremian owned at that time. In 1996, Ducharme traveled with Daniel Eremian and others from the Boston area to Antigua. _See_ Jury Trial Tr. 8-13. In Antigua, Ducharme and Eremian worked together to assist in setting up SOS operations there. _See id._ at 8-14. Daniel Eremian and Ducharme spent time together after 1996 as well. On one occasion, Daniel Eremian and Robert Eremian had dinner with Ducharme and spent the night at his home. _See id._ at 8-17. On another occasion, Ducharme had lunch in Florida with Daniel and Robert. _See id._ at 8-18. In addition, Ducharme knew that Daniel was an SOS agent. _See id._ at 8-17. Because Daniel Eremian knew Ducharme and had worked with him for SOS in Antigua, the gambling proceeds generated by Ducharme's customers were reasonably foreseeable to him.

However, the checks for SOS gambling losses that Lindsey

Perry sent to shell corporations were not reasonably foreseeable
to Daniel Eremian. Perry explained that he did not participate
in any gambling activity with Eremian and instead only saw
Eremian during baseball games involving the team on which Perry's
son and Eremian's son both played in Florida. <u>See</u> Jury Trial Tr.
10-26. The government has not proven that Eremian knew Perry
was betting with SOS or that they ever discussed SOS. Perry sent his
checks for gambling losses to Antigua. <u>See</u> Jury Trial Tr. 10-23.
However, a check drawn on Perry's checking account made payable
to "cash" was deposited in Daniel Eremian's personal bank account
on February 3, 2009. <u>See</u> Government Exhibit 101. When
confronted with this check at trial, Perry maintained that he did
not send that check to Daniel Eremian and did not know how or why
that check was deposited in Eremian's bank account. <u>See</u> Jury
Trial Tr. 10-23, 10-38. Even though Eremian likely did know by
February 3, 2009, that Perry was betting with SOS, that knowledge
does not make Perry's earlier checks reasonably foreseeable to
Eremian, because those checks had dates ranging from March 15,
2005, to May 1, 2008. <u>See</u> Government Exhibit 188-1 at 3.

Moreover, no evidence was presented demonstrating that
Eremian knew Perry by May 1, 2008. On November 14, 2011, Perry
testified that he had been living in Florida for about three
years, or since around November of 2008. <u>See</u> Jury Trial Tr. 10-
5. He also testified that he met Daniel Eremian "only recently

in Florida." Jury Trial Tr. 10-26. Thus, Perry's checks dated before May 2, 2008, were not reasonably foreseeable to Eremian.

In total, $5,611,025 of gambling proceeds in the form of checks made out, and wire transfers sent, to SOS shell corporations were reasonably foreseeable to Daniel Eremian. This sum includes $101,827 from Eremian's customers, $282,250 from Tim Lowry's customers, $502,000 from John Olsen and his customers, $3,779,601 from Frederick Porter's customers, and $945,347 from Richard Ducharme's customers. However, other proceeds deposited to the accounts of shell corporations via check or wire by bettors or agents not known to Eremian at the time were not reasonably foreseeable to him.

### D. Lyons' Personal Account

In addition to collecting cash from bettors, Todd Lyons also collected checks from bettors that he deposited into his personal bank account. See Forfeiture Tr. Day 1 at 120. Lyons deposited a total of $85,950 in checks representing SOS gambling proceeds into his personal bank account. See id. at 121.

As explained above, no evidence was presented that Eremian knew about Lyons' role at SOS. Thus, this $85,950 in SOS proceeds was not reasonably foreseeable to Eremian.

### E. Eremian's Personal Account

As an agent for SOS in Florida, Daniel Eremian recruited people to bet with SOS, helped them to place bets, and collected

checks from them when they owed money as a result of losing bets. Eremian deposited such checks into his personal bank account. These checks, in addition to the one check drawn on Lindsey Perry's checking account discussed above, totaled $416,770. See Forfeiture Tr. Day 2 at 165.

No evidence was presented demonstrating that Lyons was aware of SOS operations in Florida. Moreover, no evidence was introduced to demonstrate that Lyons knew Daniel Eremian, knew about him, or knew that he spent any time in Florida while SOS was operating. The government points out that Lyons met periodically with SOS agent Mark Thomas in New Hampshire beginning in 2000, after Thomas moved to New Hampshire from Florida where he had been betting with SOS. See Jury Trial Tr. 6-12. However, the government did not introduce evidence that Thomas informed Lyons that SOS was operating in Florida[3] and did not meet its burden to prove beyond a preponderance of the evidence that the proceeds SOS generated in Florida were reasonably foreseeable to Lyons. Accordingly, the checks totaling $416,770 in SOS gambling proceeds that Eremian deposited into his personal bank account were not reasonably foreseeable to Lyons.

---

[3] In fact, the communication between Thomas and Lyons was limited such that Thomas did not know Todd Lyons' last name even after more than five years of meeting periodically with Lyons. See Jury Trial Tr. 6-23.

## G. Summary

As explained above, the following SOS gambling proceeds were reasonably foreseeable to Todd Lyons:

(1) $21,965,024 in cash proceeds recorded in Lyons' gaming notebooks;

(2) $600,000 in additional cash proceeds Lyons collected in Massachusetts;

(3) $1,853,152 in checks made out, and wire transfers sent, to shell corporations; and

(4) $85,950 in checks deposited into Lyons' personal bank account.

Thus, in total, $24,504,126 in SOS gambling proceeds were reasonably foreseeable to Todd Lyons.

As explained above, the following SOS gambling proceeds were reasonably foreseeable to Daniel Eremian:

(1) $1,338,300 in cash proceeds recorded in Lyons' gaming notebooks;

(2) $400,000 in additional cash proceeds Lyons collected in Massachusetts;

(3) $5,611,025 in checks made out, and wire transfers sent, to shell corporations; and

(4) $416,770 in checks deposited into Eremian's personal bank account.

Thus, in total, $7,766,095 in SOS gambling proceeds were

16

reasonably foreseeable to Daniel Eremian.

### III. CONCLUSIONS OF LAW

The government seeks a joint and several Order of Forfeiture (Money Judgment) pursuant to 18 U.S.C. § 1963.  This statute requires that one who "violates any provision of section 1962 of this chapter . . . shall forfeit to the United States . . . any property constituting, or derived from, any proceeds which the person obtained, directly or indirectly, from racketeering activity or unlawful debt collection in violation of section 1962."  18 U.S.C. § 1963(a).  Because a jury convicted Lyons and Eremian under 18 U.S.C. § 1962 of racketeering conspiracy and racketeering, and found they collected unlawful debts, they must forfeit proceeds from the SOS gambling enterprise.

As the First Circuit has explained,

> [A criminal forfeiture order] may take several forms. First, the government is entitled to an *in personam* judgment against the defendant for the amount of money the defendant obtained as proceeds of the offense. Second, to the extent the government can trace any of the proceeds to specific assets, it may seek the forfeiture of those assets directly .... Third, if as a result of some act or omission of the defendant, the government cannot trace the proceeds to specific assets, it may seek the forfeiture of [substitute property].

United States v. Candeleria-Silva, 166 F. 3d 19, 42 (1st Cir. 1999).  The government has sought to forfeit certain assets (such as a helicopter and seized monies), which defendants do not oppose.  See Doc. No. 215 at 1-2, Doc. No. 216 at 1 n.1.

The government also seeks an in personam money judgment against each of the defendants for the entire proceeds of the SOS RICO enterprise. The RICO forfeiture law can be harsh because it requires a defendant to forfeit proceeds of the enterprise beyond the amount that the defendant himself personally benefitted. See United States v. Hurley, 63 F. 3d 1, 23 (1st Cir. 1995) ("We appreciate the fact that a formidable penalty can be inflicted when one disallows a passing-on defense then imposes vicarious liability for the foreseeable acts of co-conspirators."). Despite this severity, "[i]t is well-established that criminal defendants are jointly and severally liable for forfeiture of the full amount of the proceeds of their criminal offense." Candeleria-Silva, 166 F. 3d at 44; see United States v. Corrado, 227 F.3d 543, 553-555 (6th Cir. 2000). Thus, a defendant convicted of racketeering conspiracy is liable for the forfeiture of proceeds obtained by other members of the conspiracy. Hurley, 63 F. 3d at 22-23. This is true even if the defendant plays a relatively minor role in the conspiracy. See id. at 21-22. Moreover, the gross proceeds, not merely the net profits, of racketeering enterprises are subject to forfeiture under 18 U.S.C. § 1963. See id. at 21; United States v. Bucci, 582 F. 3d 108, 122 (1st Cir. 2009) (reconfirming after United States v. Santos, 553 U.S. 507 (2008), that proceeds means gross proceeds, not net profits).

18

However, a defendant's vicarious liability for forfeiting the proceeds of a RICO criminal enterprise is limited to proceeds that were reasonably foreseeable to the defendant. Hurley, 63 F.3d at 22-23. The First Circuit has explained reasonable forseeability in the sentencing context as follows:

> "Foreseeability" is conventionally defined as the "ability to see or know in advance." Black's Law Dictionary 649 (6th ed. 1990). Viewed in that light, a "reasonably foreseeable act" might well be regarded as an act that a reasonable person who knew everything that the defendant knew at the time would have been able to know in advance with a fair degree of probability.

United States v. Lacroix, 28 F.3d 223, 229 (1st Cir. 1994) (construing the term in the federal sentencing guidelines). Thus, only those proceeds that a reasonable person, knowing everything the defendant knew at the time, would have foreseen with a fair degree of probability are subject to forfeiture.

The government argues its burden is "to establish the forfeitability of the property, or the total proceeds of the violations" by "a preponderance of the evidence." (Doc. No. 236 at 19). Eremian agrees that "a preponderance of evidence standard . . . is the burden of proof which the Government must meet in this particular matter." (Doc. No. 327 at 15). Lyons does not argue otherwise. The First Circuit has suggested in a footnote that RICO forfeiture might only need to be proven by a preponderance of the evidence. United States v. Houlihan, 92 F.3d 1271, 1299 n.33 (1st Cir. 1996); cf. United States v.

19

<u>Cianci</u>, 218 F. Supp. 2d 232, 234-35 (D.R.I. 2002) ("determining what property is forfeitable [under 18 U.S.C. § 1963(a)] is a matter to be decided by a court by a preponderance of the evidence."). Both the Second Circuit and the D.C. Circuit have decided the government need only prove its RICO forfeiture allegations under 18 U.S.C. § 1963 by a preponderance of the evidence. <u>See</u> <u>United States v. Bellomo</u>, 176 F.3d 580, 595 (2d Cir. 1999) ("criminal forfeiture pursuant to 18 U.S.C. § 1963(e) depends on the preponderance of the evidence."); <u>United States v. DeFries</u>, 129 F.3d 1293, 1312 (D.C. Cir. 1997) ("the government must prove its forfeiture allegations [under 18 U.S.C. § 1963(a)] by a preponderance of the evidence."); <u>but</u> <u>see</u> <u>United States v. Pelullo</u>, 14 F.3d 881, 906 (3d Cir. 1994) (holding that beyond a reasonable doubt applies).[4]

In this case, a jury convicted Lyons and Eremian under 18 U.S.C. § 1962 of racketeering conspiracy and racketeering, and found they collected unlawful debts, based upon their participation in the SOS enterprise. As a result, they must

---

[4] If the government were required to prove what is forfeitable, and thus which proceeds are foreseeable, beyond a reasonable doubt, I would find that it met that burden only with respect to the proceeds that each defendant directly obtained himself. For Lyons, this would be only the $21,965,024 he recorded in his gaming notebooks, the $400,000 in cash he received from Christopher Means, the $200,000 in cash he received from Linda Richardson, and the $85,950 in checks deposited in his personal bank account. For Mr. Eremian, this would be only the $416,770 in checks deposited in his personal bank account.

forfeit all proceeds of the SOS organization obtained "from racketeering activity or unlawful debt collection" that were reasonably foreseeable to them.  18 U.S.C. § 1963(a)(3).  In the circumstances of this case, the government has proven that proceeds generated by SOS agents and bettors known to a defendant were reasonably foreseeable to that specific defendant.  On the other hand, I find that the government has not met its burden with respect to agents not known to the defendants, even though the existence of such agents would be conceivable.  In total, I find, by a preponderance of the evidence, that under the RICO forfeiture statute, 18 U.S.C. § 1963, $24,504,126 in SOS gambling proceeds were reasonably foreseeable to Lyons and $7,766,095 were reasonably foreseeable to Eremian.

Constitutional limitations on RICO forfeitures must be considered.  These limits apply only when the forfeitures in question are punitive in nature.  See United States v. Jose, 499 F.3d 105, 111 (1st Cir. 2007).  While there is disagreement among the federal appellate courts regarding when the forfeiture of criminal proceeds triggers the Eighth Amendment's protections,[5]

---

[5] Compare United States v. Betancourt, 422 F.3d 240, 250 (5th Cir. 2005) (holding "that in such instances the Eighth Amendment does not apply"), and United States v. Alexander, 32 F.3d 1231, 1236 (8th Cir. 1994) (holding "forfeiture of proceeds cannot be considered punishment"), and Smith v. United States, 76 F.3d 879, 882 (7th Cir. 1996) (concluding that forfeiture of proceeds "can hardly be termed punishment"), and United States v. Lot 41, Berryhill Farm Estates, 128 F.3d 1386, 1395 (10th Cir. 1997) (holding "forfeiture of drug proceeds ... can never be

in the First Circuit, all forfeitures are subject to the Eighth
Amendment's protections "'if they constitute punishment for an
offense.'" United States v. Heldeman, 402 F.3d 220, 223 (1st Cir.
2005) (quoting United States v. Bajakajian, 524 U.S. 321, 328
(1998)).  Under Heldeman, when a "forfeiture [is] imposed at the
culmination of a criminal proceeding and requires conviction of
an underlying felony," it is punishment for the offense. Id.;
Jose, 499 F.3d at 111.  Thus, the constitutional limits on
forfeitures apply here.

    "[T]he touchstone of the constitutional inquiry under the
Excessive Fines Clause is the principle of proportionality: The
amount of the forfeiture must bear some relationship to the
gravity of the offense that it is designed to punish."
Bajakajian, 524 U.S. at 334; Austin v. United States, 509 U.S.
602 (1993); Alexander v. United States, 509 U.S. 544 (1993).
Thus, a criminal forfeiture is unconstitutional under the Eighth
Amendment's Excessive Fines Clause if it is "'grossly
disproportional to the gravity of the defendant's offense.'"
United States v. Aquasvivas-Castillo, 668 F.3d 7, 16-17 (1st Cir.

---

constitutionally excessive"), with United States v. Jalaram,
Inc., 599 F.3d 347, 354 (4th Cir. 2010) (rejecting argument that
criminal forfeiture of proceeds is nonpunitive by definition),
and United States v. Browne, 505 F.3d 1229, 1281-82 (11th Cir.
2007) (concluding the forfeiture of racketeering proceeds
constituted punishment), and United States v. Corrado, 227 F.3d
543, 552 (6th Cir. 2000) (holding the forfeiture of proceeds
derived from racketeering to be consistent "with the punitive
purpose of RICO").

2012) (quoting <u>Bajakajian</u>, 524 U.S. at 337 (1998)); <u>Jose</u>, 499 F.3d at 111; <u>Heldeman</u>, 402 F.3d at 223.

Under <u>Bajakajian</u>, to determine whether a forfeiture is grossly disproportional, a court should consider three factors: (1) whether the defendant falls into the class of persons at whom the criminal statute was principally directed; (2) other penalties authorized by the legislature (or the Sentencing Commission); and (3) the harm caused by the defendant.[6] <u>Aquasvivas-Castillo</u>, 668 F.3d at 17; <u>United States v. Levesque</u>, 546 F.3d 78, 83 (1st Cir. 2008).

The first question is whether Lyons and Eremian fall into the class of persons at whom the criminal statute was principally directed. In light of the evidence at trial and the jury's conviction of Lyons and Eremian for racketeering conspiracy, racketeering, and collection of an unlawful debt in violation of 18 U.S.C. § 1962 based on their participation in the SOS gambling

---

[6] The First Circuit has also interpreted <u>Bajakajian</u> to require courts "to consider whether forfeiture would deprive the defendant of his or her livelihood." <u>United States v. Levesque</u>, 546 F.3d 78, 83 (1st Cir. 2008). "It is the defendant's burden, not the government's, to raise the issue of future deprivation of livelihood." <u>Aquasvivas-Castillo</u>, 668 F.3d at 16 (citing <u>United States v. Fogg</u>, 666 F.3d 13, 19 (1st Cir. 2011)). Furthermore, "a defendant's inability to satisfy a forfeiture at the time of conviction, in and of itself, is not at all sufficient to render a forfeiture unconstitutional." <u>Aquasvivas-Castillo</u>, 668 F.3d at 16 (quoting <u>Fogg</u>, 666 F.3d at 19). Here, although initially raising the deprivation-of-livelihood issue, Defendants Lyons and Eremian both waived at the forfeiture bench trial any claim of deprivation of livelihood. <u>See</u> Forfeiture Tr. Day 3 at 4-5.

enterprise, it is clear that Lyons and Eremian fall into the class of persons at whom the criminal RICO statute was principally directed. Eremian appears to suggest he might not fall into that class because the SOS enterprise did not use violence and the bettors Eremian managed were generally wealthy and could afford to lose money. While true, even when a defendant's "offense conduct was not typical . . . and did not involve guns or violence" he nonetheless can fall into the class of persons at whom a criminal statute was principally directed as required under Bajakajian. United States v. Heldeman, 402 F.3d 220, 223 (1st Cir. 2005).

It is also necessary to consider what other penalties the legislature or the United States Sentencing Commission has authorized for the offense. Under this second Bajakajian factor, courts compare the forfeiture amount to the statutory maximum fine and sentencing guidelines fine range for the offense. For example, in Jose, the forfeiture amount exceeded the top of the guidelines range by less than a multiple of four and thus the First Circuit found it was not disproportionate under the Eighth Amendment. See 499 F.3d at 112. In contrast, in United States v. Varrone, the Second Circuit found a forfeiture to be excessive where the amount was 40 times the maximum statutory fine. See United States v. Varrone, 554 F.3d 327, 331-32 (2nd Cir. 2009). "Some circuits have treated a forfeiture of less than the

24

statutory or guideline maximum as strongly suggesting or conclusive of compliance with the Eighth Amendment." <u>Heldeman</u>, 402 F.3d at 220 (collecting cases).

The Congress has authorized fining defendants such as Lyons and Eremian who have been convicted of violating 18 U.S.C. § 1962 in an amount "not more than twice the gross profits or other proceeds" obtained from their illegal racketeering activity or debt collection. 18 U.S.C. § 1963(a). Thus, any forfeiture of RICO proceeds is necessarily no more than half of the maximum fine authorized by the legislature.[7] As such, the government argues that RICO forfeitures of racketeering proceeds can never be unconstitutionally disproportionate. The First Circuit has explained that "[i]t is well-established that criminal defendants are jointly and severally liable for forfeiture of the full amount of the proceeds of their criminal offense, and that the imposition of such a forfeiture judgment does not constitute an unconstitutionally excessive fine." <u>United States v. Candeleria-Silva</u>, 166 F. 3d at 44; <u>see</u> <u>Hurley</u>, 63 F. 3d at 23 ("holding a defendant liable for an amount of money foreseeably laundered by himself and his own co-conspirators is quite rational based on a proportionality analysis.").

---

[7] While Eremian accurately notes the maximum fine is $250,000 for each count under 18 U.S.C. § 3571(b)(3), this is the general criminal fine statute. Eremian ignores the more specific 18 U.S.C. § 1963(a), which sets forth the maximum fine for RICO violations as described above.

Under the Sentencing Guidelines, the maximum fine range, according to the presentence report, is from $7,500 to $75,000 for Eremian and from $10,000 to $100,000 for Lyons. See P.S.R. (referencing U.S.S.G. § 5E1.2(c)(1), (c)(2)). However, the Guidelines also authorize forfeiture as provided by statute. See U.S.S.G. § 5E1.4 ("Forfeiture is to be imposed upon a convicted defendant as provided by statute."). Here, the RICO statute allows for a forfeiture of twice the proceeds obtained from the racketeering activity. See 18 U.S.C. § 1963(a). In sum, a consideration of the penalties authorized by the legislature and the Sentencing Commission suggests that the forfeiture of all proceeds reasonably foreseeable to each defendant is not unconstitutionally disproportionate. See Candeleria-Silva, 166 F. 3d at 44 (1st Cir. 1999) ("In [United States v. Hurley, 63 F. 3d 1 (1st Cir. 1995)], each of the defendants, including the relatively minor participants, was ordered to forfeit substitute assets up to approximately $140 million in value. If holding each defendant jointly and severally liable to forfeit that amount in substitute assets did not violate the Excessive Fines Clause, then the forfeiture [in this case] does not.").

Finally, it is necessary to examine the harm caused by the defendants. Eremian argues that the bettors he managed were wealthy and did not suffer any economic distress as a result of

their gambling activity and thus he caused little harm.  He

points out that many of the winning bettors decided to "let it

ride" rather than recoup their winnings.  The First Circuit has

upheld at least one forfeiture award even when those affected by

a defendant's illegal activity were willing participants who

sought the nonviolent yet illegal services the defendant offered.

See United States v. Heldeman, 402 F.3d 220, 223 (1st Cir. 2005)

(upholding forfeiture of the house of a doctor who fraudulently

provided body-builders with steroids and prescription drugs

despite the fact that "Heldeman's offense conduct was not typical

of drug dealing and did not involve guns or violence[, because]

it was calculated, repeated, and done for Heldeman's benefit

rather than misguided sympathy . . . .").  While it is true that

most of the bettors were not harmed, and there was no proven

violence, at least one SOS bettor did lose so much money that he

suffered economic distress.  See, e.g., Jury Trial Tr. 9-95 to 9-

96 (bettor Justin Waranis became unable to handle his gambling

debts).  In addition, societal harm is caused by committing acts

that Congress has criminalized.  Cf. United States v. Jose, 499

F.3d 105, 111 (1st Cir. 2007) (involving cash smuggling statute).

Most significantly, the amount to be forfeited is not

disproportionate because SOS generated additional forfeitable

proceeds which have not been included in the calculation.  For

example, SOS agents received commissions of 25%-50% of the losses

of the bettors they managed, but these commissions were held back by agents before money was turned over to SOS.  The government is not seeking to forfeit those millions of dollars in commissions increasing the amount of gross proceeds.  See Forfeiture Tr. Day 1 at 55-56.  Similarly, the government has not sought to forfeit the proceeds SOS generated in the form of cash gambling losses that bettors mailed to Antigua.  See Jury Trial Tr. 8-21.  In addition, because it did not have the necessary records, the government is not seeking to forfeit any checks deposited before 2003 to the accounts of SOS shell corporations, Todd Lyons, or Daniel Eremian despite the fact that SOS began operating in 1996. See Forfeiture Tr. Day 1 at 187, Day 3 at 29.  The Court has not ordered forfeiture of the extrapolated cash proceeds because of the lack of sufficient proof as to the amount.  Still, it is clear large amounts were collected.  The fact that millions of additional dollars of SOS proceeds were likely subject to forfeiture but were not included in the calculation because of inability to determine the amounts demonstrates that forfeiture here is not grossly disproportionate to the gravity of the defendants' offenses.

In sum, the forfeiture of $24,504,126 in SOS gambling proceeds is not grossly disproportionate to the gravity of Lyons' offense, and the forfeiture of $7,766,095 is not grossly disproportionate to Eremian's offense.

Lyons raises several additional objections to the government's forfeiture request. First, he argues the government has double-counted SOS proceeds and "there is no evidence that funds Lyons paid to other agents was directly attributable to any particular winning bet." Doc. No. 238 at 20. However, I find by a preponderance of the evidence that the funds Lyons paid to other agents were provided to allow agents to pay winning bettors. See Forfeiture Tr. Day 1 at 50 (explanation of IRS agent Lemansky that numbers recorded in the "out" columns of Lyons' gaming notebooks represent payments to winning bettors). He also argues Robert Eremian paid $3,000,000 in federal taxes that should be deducted from any amount to be forfeited by Lyons. However, the taxes paid by Robert Eremian were personal income taxes and "had nothing to do with the SOS business." Forfeiture Tr. Day 2 at 5.

Lyons also contends that any proceeds recorded in his gaming notebooks before 2001 are not subject to forfeiture because placing bets on sporting events via the internet was not illegal under Antigua, Massachusetts, or United States law before 2001. The government has not responded to this late-arising argument, which was poorly briefed. One problem with this argument is that SOS operated in Massachusetts and Florida and much of the gambling activity there violated the laws of those states, both of which prohibited using telephones for gaming purposes. See

<u>United States v. Lyons</u>, No. 10–10159–PBS, 2012 WL 1593175, at *5
(D. Mass. May 4, 2012); Fla. Stat. § 849.14 (2012); Mass. Gen.
Laws ch. 271, § 17A (2012).  Thus, a substantial portion of pre-
2001 SOS proceeds was obtained from the unlawful collection of
debts "incurred or contracted in gambling activity which was in
violation of the law of the United States [or] a State or
political subdivision thereof" and must therefore be forfeited
pursuant to 18 U.S.C. § 1963(a)(3).  18 U.S.C. § 1961(6).  Lyons
has pointed to no evidence that internet gambling predominated
before 2001, and it is undisputed that telephone betting
continued at all times.  Even if some of the proceeds resulting
from bets placed on the internet were not incurred in illegal
gambling activity, they were commingled with proceeds that were
generated by illegal telephone bets and thus are subject to
forfeiture.  <u>Cf.</u> <u>Aquasvivas-Castillo</u>, 668 F.3d at 17 (quoting
<u>United States v. McGauley</u>, 279 F.3d 62, 76 (1st Cir. 2002) (in a
money laundering forfeiture, "'legitimate funds that are
commingled with illegitimate funds can be forfeited if the
legitimate funds were somehow involved in the offense . . .
.'")).

Finally, defendants point out how unfair it is that the
government seeks to hold them jointly and severally liable for
the proceeds generated by other agents who testified, but the
other agents, who were immunized, get off scot-free.  Lyons

30

further argues it is unfair that in a separate illegal gambling case that the government brought against Richard Settipane and others, which Lyons contends is related to this case but which the government suggests is unrelated, the government did not seek forfeiture of the full amount of forfeitable proceeds yet here seeks to forfeit millions of dollars from Lyons. <u>See</u> Doc. No. 238 at 6. Eremian acknowledges, however, that "[t]he Court may be powerless to interfere with the Government's exercise, no matter how unfair or misguided, of its discretion to prosecute both criminally and civilly." Doc. No. 237 at 19. While any monies collected from co-defendants can be used to offset the forfeiture amount, defendants are jointly and severally liable.

Lyons' other objections to the government's forfeiture request are similarly without merit.

### ORDER

Todd Lyons shall forfeit $24,504,126, and Daniel Eremian shall forfeit $7,766,095, pursuant to 18 U.S.C. § 1963.


<u>/s/ PATTI B. SARIS</u>
PATTI B. SARIS
United States District Judge